**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roger Royer, | No. CV 07-1103-PHX-JAT |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael Astrue, Commissioner, Social Security Administration, | |
| Defendant. | |

Plaintiff Roger Royer filed this action under 42 U.S.C § 405(g) to seek judicial review of Defendant's denial for his request for disability insurance benefits under Title II of the Social Security Act. (Doc. ## 1 (Complaint); 18 (Def.'s Statement of Facts).) This appeal is now before the Court on the parties' cross-motions for summary judgment. (Doc. ## 11 (Pl.'s Mot. for Summ. J.); 15 (Def.'s Cross-Mot. for Summ. J.).) After considering the parties' arguments and the evidence in the record, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross-Motion for Summary Judgment.

**I.     PROCEDURAL HISTORY**

On October 1, 2003, Plaintiff filed an application for disability insurance benefits, alleging a disability onset date of February 2, 2002. (R. at 50-52.) Plaintiff asserts he is disabled due to asthma, degenerative disc disease, migraines, arthritis, thyroid imbalance, high blood pressure caused by the pain and stress, and carpal tunnel syndrome. (R. at 61.) The Social Security Administration ("SSA") denied Plaintiff's application and request for

1 reconsideration. (R. at 23-26, 31-34.) Plaintiff timely requested and received a hearing 2 before Administrative Law Judge ("ALJ") David R. Mazzi, held on May 3, 2006. (R. at 36, 3 232-47.)

4 On December 15, 2006, the ALJ denied Plaintiff's request for benefits, finding that 5 Plaintiff was not disabled, under 20 C.F.R. § 404.1520(g), since Plaintiff's impairments do 6 not prevent him from making an adjustment to other work. (R. at 19.) On April 6, 2007, the 7 Appeals Council denied Plaintiff's request for review and adopted the decision of the ALJ 8 as the final decision of the Commissioner. (R. at 5-7.) Plaintiff filed this complaint on June 9 2, 2007, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision. (Doc. 10 # 1.)

11 **II.    STANDARD OF REVIEW**

12 The court will not set aside the Commissioner's decision unless: (1) the findings of 13 fact are not supported by substantial evidence in the record, or (2) the decision is based on 14 a legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "Substantial 15 evidence means more than a mere scintilla but less than a preponderance; it is such relevant 16 evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews* 17 *v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Flaten v. Sec'y of Health & Human* 18 *Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995) ("Substantial evidence is relevant evidence which, 19 considering the record as a whole, a reasonable person might accept as adequate to support 20 a conclusion."). In determining whether substantial evidence supports the Commissioner's 21 decision, the court must consider the record as a whole and review evidence both supporting 22 and detracting from the decision. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The 23 ALJ's role is to make credibility determinations and to resolve conflicts in medical 24 testimony. *Andrews*, 53 F.3d at 1039. If the evidence is susceptible to more than one 25 rational interpretation, one of which supports the ALJ's decision, then the court will uphold 26 the decision. *Id.* at 1040. This is because "[t]he trier of fact and not the reviewing court must 27 resolve conflicts in the evidence, and if the evidence can support either outcome, the court 28 may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016,

1019 (9th Cir. 1992). However, if the ALJ applied improper legal standards, the court must set aside a decision even if it is supported by substantial evidence. *See Ceguerra v. Sec'y of Health & Human Servs.*, 993 F.2d 735, 739 (9th Cir. 1991).

To qualify for disability benefits under the Social Security Act, a claimant must show, among other things, that he is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A person is

> under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

*Id.* § 423(d)(2)(A).

The Social Security regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520; *see also Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

1. First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the claimant is not disabled.

2. If the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." *Id.* § 404.1520(a)(4)(ii). To be considered severe, the impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). Further, the impairment must either be expected "to result in death" or "to last for a continuous period of twelve months." *Id.* § 404.1509 (incorporated by reference in *id.* §

1  404.1520(a)(4)(ii)). If the claimant does not have a severe impairment, the claimant is not
2  disabled.

3    3. Having found a severe impairment, the ALJ next determines whether the
4  impairment "meets or equals" one of the impairments listed in the regulations. *Id.* §
5  404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry. If not,
6  before proceeding to the next step, the ALJ will make a finding regarding the claimant's
7  "residual functional capacity based on all the relevant medical and other evidence in [the]
8  record." *Id.* § 404.1520(e). A claimant's "residual functional capacity" is the most he can
9  do despite all his impairments, including those that are not severe, and any related symptoms.
10 *Id.* § 404.1545(a)(1).

11   4. At step four, the ALJ determines whether, despite the impairments, the claimant
12 can still perform "past relevant work." *Id.* § 404.1520(a)(4)(iv). To make this determination,
13 the ALJ compares its "residual functional capacity assessment . . . with the physical and
14 mental demands of [the claimant's] past relevant work." *Id.* § 404.1520(f). If the claimant
15 can still perform the kind of work he previously engaged in, the claimant is not disabled.
16 Otherwise, the ALJ proceeds to the final step.

17   5. At the final step, the ALJ determines whether the claimant "can make an
18 adjustment to other work" that exists in the national economy. *Id.* § 404.1520(a)(4)(v). In
19 making this determination, the ALJ considers the claimant's "residual functional capacity"
20 and his "age, education, and work experience." *Id.* § 404.1520(g)(1). If the claimant can
21 perform other work, he is not disabled. If the claimant cannot perform other work, he will
22 be found disabled. As previously noted, the Commissioner has the burden of proving the
23 claimant can perform other work. *Reddick*, 157 F.3d at 721.

24 **III.  FACTUAL BACKGROUND**

25   **A.  Plaintiff's Disability Claim**

26   Plaintiff claims he has been unable to work since February 2, 2002. (R. at 50-52.)
27 Plaintiff alleges that he is disabled due to asthma, degenerative disc disease, migraines,
28

- 4 -

1  arthritis, thyroid imbalance, high blood pressure caused by the pain and stress, and carpal
2  tunnel syndrome. (R. at 61.)

### B. Plaintiff's Background

Plaintiff was born on July 7, 1969, and stands 5 feet, 11 inches tall. (R. at 60.) Presently, he lives with the mother of his son and his child. He has a high school education, two years of college, and has completed training at bartending school. (R. at 67.) From 1990 to 1995, he worked as a barback/bartender and then a change/floor person from 1995 to 1999, both at a casino. (R. at 62.) From 2000 until he stopped working in 2002, Plaintiff was a manager/cashier at a convenience store. (R. at 62.)

On May 3, 2006, Plaintiff testified to the ALJ regarding his allegedly disabling conditions. (R. at 232-47.) He testified that he stopped working because his cashier job required him to lift up to 50 pounds at times and he was unable to do so. (R. at 236.) Plaintiff stated that he is unable to stand for more than 15 to 20 minutes at a time. (R. at 236.) He experiences pain in his lower back and legs while walking and standing. (R. at 238-39.) Plaintiff testified that he had carpal tunnel surgery on his left wrist in March 2005. (R. at 237.) While his left wrist does not hurt like it did before surgery, it is very painful if he bumps it in certain spots, he does not have the strength he used to, it impacts his ability to grip things, and computer keyboarding is painful. (R. at 237.) Plaintiff anticipated having surgery on his left wrist in a few months. (R. at 237.) Plaintiff also stated that he is unable to turn his head to the left or right very far without pain, and believes his neck is the cause of most of his migraines. (R. at 238.) Plaintiff indicated Dr. Johnson wants to wait to address his neck problems until after his second wrist surgery. (R. at 241.) Plaintiff stated he is taking nine medications and that he experiences side effects of drowsiness, shakes, and the inability to sleep. (R. at 238.) He is taking no medication for his diabetic neuropathy, but indicated he is waiting for his insurance provider to approve treatment by a diabetic specialist. (R. at 239.)

Regarding Plaintiff's daily routine, he indicated that trying to do household chores is easy and he can fold laundry, but he has to take naps and lay down because standing is

- 5 -

1  painful. (R. at 239.) Also, Plaintiff stated he has to sit on a stool to do dishes and it is
2  difficult because he drops a lot of things due to his shaking. (R. at 239.) Plaintiff testified
3  he has to nap several times per day, for a total of 2 to 3 hours. (R. at 240.) Heسleeps until
4  the pain wakes him up. (R. at 240.) If he cannot sleep, he lays down until he feels he can
5  get back up. (R. at 240.) Plaintiff stated that his pain is a 7, on a scale of 1 to 10, on an
6  average day, but it has gotten so bad that he has gone to the hospital. (R. at 240.) Plaintiff
7  testified he cannot work 8 hours per day, 40 hours per week on a sustained basis because he
8  has to sleep or lay down during part of the day due to his pain. (R. at 241-42.) When he is
9  in pain, he is unable to concentrate and is told he cannot remember things that happened
10 during that time. (R. at 242.)

### C. Record Evidence

#### 1. Physical Impairments

On February 28, 2002, Plaintiff visited an emergency room with complaints of neck and back pain that he stated started four days prior. (R. at 134.) He was treated with medications and discharged without restrictions. (R. at 133.) On June 25, 2002, Plaintiff became a patient of Dr. Berkenbile and reported a history of migraine headaches, some dyspnea, and neuropathy and tingling of the left hand. (R. at 113.) Dr. Berkenbile examined Plaintiff and recommended he see specialists for his valley fever and neuropathy. (R. at 113.) On July 31, 2002, Plaintiff was seen by Dr. Bennett, a neurologist, with a chief complaint of headaches, but also complained of pain in his left arm, neck, and low back. (R. at 156-157.) Dr. Bennett gave Plaintiff samples of medications for his migraines, but said he did not have enough migraines to justify prophylaxis. (R. at 156.) On September 4, 2002, results of nerve conduction testing of Plaintiff's upper left extremity were normal and sensory examination revealed no deficits to primary sensory modalities. (R. at 155.) Cervical range of motion was full, motor testing was normal, and reflexes symmetrical. (R. at 154.) Despite essentially normal results, Dr. Bennett felt Plaintiff's symptoms warranted further evaluation and referred him for an MRI and plain films of his cervical spine. (R. at 155.) On September 17, 2002, Dr. Berkenbile indicated that Dr. Riedy had prescribed

- 6 -

1  inhalers. (R. at 110.) On October 2, 2002, an MRI revealed a disc bulge at C6-C7 with
2  minimal dehydration. (R. at 152.)

3        On April 30, 2003, Plaintiff saw Dr. Bennett, complaining of tingling, numbness, and
4  impaired grip in his left hand; Dr. Bennett performed EMG testing. (R. at 150.) Dr. Bennett
5  did not find any evidence of cervical radiculopathy, but noted bilateral carpal tunnel
6  syndrome of moderate severity, worse on the left. (R. at 150.) He also noted clinical
7  evidence of osteoarthritis at the left thumb base. (R. at 150.) On July 25, 2003, Plaintiff first
8  visited Dr. Mane, complaining of asthma, degenerative disc disease in his neck and back,
9  severe migraines, carpal tunnel syndrome, hypertension, and osteoarthritis. (R. at 198.)

10       On May 3, 2004, Dr. Barker performed a consultative exam and reviewed Plaintiff's
11 medical records on behalf of the state agency. (R. at 158-68.) Dr. Barker reported that
12 Plaintiff indicated he had migraine symptoms about once every two months. (R. at 161.) Dr.
13 Barker indicated that Plaintiff's complaints of pain in his hands were not consistent with
14 carpal tunnel syndrome. (R. at 159.) Plaintiff complained of pain from his mid-back, down
15 into his lumbosacral spine and tail bone, for which he had never been treated. (R. at 159.)
16 Dr. Barker's examination revealed no abnormalities. (R. at 160-61.) Plaintiff had a negative
17 Tinel's sign and Phalen's maneuver, two tests used to confirm carpal tunnel syndrome, and
18 there was no evidence of weakness or wasting in his hands that would correlate with carpal
19 tunnel syndrome. (R. at 160.) Dr. Barker further reported Plaintiff had excellent grip
20 strength and full function of both hands. (R. at 160.) Dr. Barker also observed that Plaintiff
21 could go up and down stairs at a brisk pace without using the handrail. (R. at 161.) Dr.
22 Barker remarked that, in spite of his complaints, Plaintiff was able to perform range of
23 motion tests in his cervical and lumbar spines without discomfort. (R. at 160.) An x-ray
24 showed mild disc space narrowing at L4-L5 and L5-S1, with no evidence of
25 spondylolisthesis or spondylolysis. (R. at 167.) Dr. Barker concluded that Plaintiff could
26 lift 50 pounds occasionally and 25 pounds frequently, and could be on his feet for 6 hours
27 and sit for 6 hours in an eight-hour day. (R. at 161.) He indicated that Plaintiff had no other
28 functional limitations. (R. at 161.)

1        On September 21, 2004, Plaintiff visited Dr. Mane and she filled out his disability
2 paperwork. (R. at 190.) She indicated Plaintiff could sit for 2 hours and stand for 2 hours
3 in an eight-hour day. (R. at 191.) She said he could lift and carry up to 50 pounds
4 occasionally and 20 pounds frequently. (R. at 191.) She further indicated that Plaintiff could
5 use his right and left hand for continuous grasping, pushing/pulling of controls, and fine
6 manipulation, but could not continuously perform a combination of these activities. (R. at
7 192.) She also indicated some postural limitations. (R. at 192.) She concluded Plaintiff had
8 less than full-time physical capacity with moderate to moderately severe pain. (R. at 191-
9 93.)

10       On October 13, 2004, Plaintiff was seen by Dr. Johnson, an orthopedic surgeon. (R.
11 at 201.) He observed Plaintiff had a Phalen's sign that was somewhat positive and
12 tenderness and pain in his wrist. (R. at 201.) Electrodiagnostic testing on October 21, 2004
13 revealed prolonged latency across the wrist, mild median sensory mononeuropathy across
14 the right and left wrists, and mild right radial sensory neuropathy. (R. at 211-12.)

15       On February 8, 2005, Plaintiff became a patient of Dr. Aguila, a neurologist. (R. at
16 228-29.) Plaintiff reported chronic neck and low back pain that prohibited him from walking
17 one or two blocks without experiencing severe pain in the lumbar area. (R. at 228.) Plaintiff
18 also complained of bilateral wrist pain, especially on the left side, poor grip, numbness, and
19 tingling. (R. at 228.) The pain on the left wrist had become increasingly worse in the prior
20 few months. (R. at 228.) He also complained of two or three migraine headaches per month.
21 (R. at 228.) Dr. Aguila's examination found that his cervical, thoracic, and lumbar paraspinal
22 muscles were nontender and straight leg testing was negative. (R. at 229.) Cervical and
23 lumbar ranges of motion were full in all directions. (R. at 229.) Migraine headaches were
24 reported to be well controlled with prophylactic medication. (R. at 229.) Dr. Aguila did find
25 positive Tinel's and Phalen's sign on the left wrist and a positive Tinel's on the right wrist,
26 indicating moderate right and advanced left carpal tunnel syndromes. (R. at 229.) Motor
27 strength was normal in all muscle groups of the upper and lower extremities, except in the
28 left hand. (R. at 229.) On March 24, 2005, Dr. Johnson performed a left carpal tunnel

- 8 -

1  release.  (R. at 217.)  His post-surgery evaluation on April 1, 2005 indicated an excellent
2  result with increased sensation and no pain in Plaintiff's hand.  (R. at 213.)

3        On August 2, 2005, Plaintiff reported to Dr. Aguila that he had one to two migraine
4  headaches per week, but Dr. Aguila noted that there had been no change in the neurological
5  exam.  (R. at 227.)  Dr. Aguila also noted Plaintiff had done well since the carpal tunnel
6  surgery.  (R. at 227.)  On November 2, 2005, Plaintiff's neurological exam was again
7  essentially normal, but Plaintiff continued to complain of low back pain and dysesthesias of
8  the lower extremities.  (R. at 226.)  Dr. Aguila also noted recent findings of peripheral
9  neuropathy. (R. at 226.)  Dr. Aguila also observed that Plaintiff's hemoglobin was slightly
10 elevated and he had a borderline blood glucose elevation.  (R. at 226.)  On November 21,
11 2005, Dr. Mane stated that Plaintiff was borderline diabetic and indicated that his blood sugar
12 should be frequently tested.  (R. at 210.)

13       On April 28, 2006, Dr. Aguila completed a form regarding Plaintiff's ability to do
14 work, indicating Plaintiff could sit for 3 hours and stand for 2 hours in an eight-hour day.
15 (R. at 219.)  He also said Plaintiff could lift up to 25 pounds occasionally and frequently, and
16 carry up to 20 pounds occasionally.  (R. at 219-20.)  Further, Plaintiff had some manipulative
17 limitations in his left hand and some postural limitations.  (R. at 220.)  Dr. Aguila also
18 completed a headache questionnaire, indicating Plaintiff had one migraine per month.  (R.
19 at 224.)  He reported Plaintiff's score on the Headache Impact Test was 67, where a score
20 of 60 or more is indicative of a severe headache that has a profound impact on ability to
21 function for ordinary household functions or work activity.  (R. at 222-23.)

22       **2.     Mental Impairments**

23      On June 24, 2004, Dr. Doss performed a psychological evaluation.  (R. at 169-74.)
24 Dr. Doss found no psychiatric diagnosis or condition.  (R. at 169, 175.)

25       **3.     Vocational Expert**

26      The Vocational Expert ("VE") testified regarding past work history and potential for
27 future employment.  (R. at 242-46.)  The ALJ first presented the VE with a hypothetical
28 individual who is capable of no more than light work, but with additional restrictions of a

- 9 -

need for a sit/stand option every 15 minutes, no more than a total of 4 hours standing and walking throughout the day, no forceful gripping with either upper extremity, and a need to avoid concentrated respiratory irritants, dust, fumes, smoke, gases, and poor ventilation. (R. at 243.) The VE stated that this person would be precluded from performing Plaintiff's past work history, but that this person would be able to get a job as a parking lot attendant or a ticket taker. (R. at 243-44.)

The VE classified the parking lot attendant job as light and unskilled employment. (R. at 244.) She stated that there are 39,984 such jobs nationally and 914 in Arizona. (R. at 244.) The VE also classified a ticket taker as light and unskilled employment. (R. at 244.) She stated that there are 54,524 of these positions nationwide and 1,130 in Arizona. (R. at 244.)

The ALJ's second hypothetical presented the same person with the added restriction of no more than occasional, fine manipulation. (R. at 244.) The VE opined that this would eliminate the jobs of parking lot attendant and ticket taker. (R. at 244.) The ALJ's third hypothetical eliminated the manipulation restriction, but added no more than occasional rotation of the neck. (R. at 244.) The VE concluded that it would substantially erode the base of those jobs because both require rotation of the neck on a regular basis. (R. at 245.) The ALJ's final hypothetical addressed a person that had to lie down during the work day, beyond normal breaks. (R. at 245.) The VE stated that there would be no work for a person with that restriction. (R. at 245.)

Upon examination by Plaintiff's attorney, the VE clarified that the respiratory aspect of the ALJ's first hypothetical would probably erode the job numbers for the parking lot attendant by half, based on if the person was inside a ticket booth or outside. (R. at 245-46.) The VE also concluded that the limitations presented in Dr. Mane's assessment on September 21, 2004, precluded the Plaintiff from sustaining an eight-hour day. (R. at 246.)

## IV. THE ALJ'S DECISION

The ALJ evaluated Plaintiff's alleged disability according to the five-step evaluation process set forth in 20 C.F.R. § 404.1520. (R. at 14-20.) The ALJ first determined that

1 Plaintiff has not been gainfully employed since before the alleged onset date. (R. at 15, 19.)
2 Next, the ALJ found that Plaintiff's degenerative disc disease in the cervical spine and
3 lumbar spine, bilateral carpal tunnel syndrome, diabetes mellitus, asthma, and migraine
4 headaches, in combination, are "severe" within the meaning of 20 C.F.R. § 404.1521. (R.
5 at 15, 19.) However, the ALJ concluded that the Plaintiff's impairments failed to meet the
6 criteria of the third step. (R. at 15, 19.) This step requires a claimant's impairment(s) to
7 "meet[] or equal[] one of [the SSA's] listings in appendix 1 of this subpart and meet[] the
8 duration requirement . . . ." 20 C.F.R. § 404.1521(a)(4)(iii). Specifically, the ALJ states that
9 "the medically established disorders, however, are not attended by clinical and laboratory
10 findings that meet or equal any listed impairment." (R. at 15.)

11 Finally, the ALJ examined whether Plaintiff retained the residual functional capacity
12 ("RFC") to perform his past relevant work or other work that exists in significant numbers
13 in the national economy. (R. at 15.) The ALJ determined that Plaintiff retains the RFC "to
14 perform light work, as defined at 20 C.F.R. § 404.1567(b), with a sit or stand option every
15 fifteen minutes and no more than four hours total of standing or walking in an eight-hour
16 workday." (R. at 15.) He also found "an ability to occasionally lift up to twenty pounds and
17 to frequently lift and/or carry ten pounds." (R. at 17.) The ALJ further found that Plaintiff
18 "is precluded from bilateral power gripping and should avoid respiratory irritants, including
19 fumes, gases and poor ventilation." (R. at 15.) In so finding, the ALJ dismissed the medical
20 opinions of Dr. Mane and Dr. Aguila, relative to ability to stand and walk, because he found
21 no supporting medical evidence for their opinion. (R. at 17.) The ALJ also found a lack of
22 medical evidence relating to diabetes mellitus, Plaintiff's back disorder, and carpal tunnel
23 syndrome. (R. at 17.) Finally, the ALJ found that, when considering the evidence as a
24 whole, the alleged intensity, persistence, and functionally limiting effects of the Plaintiff's
25 subjective complaints are not fully credible. (R. at 18, 20.)

26 Based on the RFC and the testimony of the VE, the ALJ found that although the
27 Plaintiff is incapable of performing his past work, he is capable of performing work as a
28 parking lot attendant or ticket taker. (R. at 18-20.) The number of such positions that

Plaintiff can perform despite his impairments exist in significant numbers in the economy. (R. at 19-20.) Accordingly, the ALJ held that Plaintiff was not disabled within the meaning of the Social Security Act, citing 20 C.F.R. § 404.1520(g). (R. at 19-20.)

## V.     DISCUSSION

Plaintiff argues that the ALJ improperly rejected the opinions of the treating physicians and should have considered a closed period of benefits. (Pl.'s Mem. at 4, 6.)

### A.  Treating Physician Opinion

Generally, an ALJ must give a treating physician's opinion greater weight than other opinions unless the ALJ gives specific and legitimate reasons for failing to give the treating physician's opinion greater weight. *See Rollins v. Massanari*, 261 F.3d 835, 856 (9th Cir. 2001) (finding that an opinion from a treating physician may be rejected for specific and legitimate reasons). However, although the treating physician's opinion is entitled to greater weight, "[t]he opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r*, 169 F.3d 595, 600-01 (9th Cir. 1999). The more evidence presented by the physician in the form of signs or laboratory findings, the more weight and credence the ALJ will give to the opinion. 20 C.F.R. § 404.1527(d)(3).

In this case, Plaintiff argues that the ALJ erred in not crediting Dr. Mane's and Dr. Aguila's opinions related to his headaches. (Pl.'s Mem. at 4-6.) These opinions, however, are based entirely on Plaintiff's subjective complaints and are not supported by objective medical evidence. The treatment notes of both doctors and the headache questionnaire completed by Dr. Aguila—the only places where the record reflects their opinions regarding headaches—demonstrate this point. (R. at 113, 156, 161, 198, 222-29.) Thus, if the ALJ properly discredited Plaintiff's subjective complaints, the treating physician's opinions were properly rejected as well.

In deciding whether to accept subjective complaints, the ALJ must perform the analysis adopted in *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986), as a threshold matter. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). If the claimant produces evidence to

satisfy the *Cotton* test, the ALJ can reject the claimant's testimony on severity of symptoms only by giving "specific, clear, and convincing reasons for doing so." *Id.* Under *Cotton*, the claimant who bases disability on subjective complaints must produce objective medical evidence of an underlying impairment (but not of the pain or fatigue) and must show that the impairment or combination of impairments reasonably could "produce some degree of symptom." *Id.* at 1281-82. The latter prong of the test does not require evidence of a causal relationship between the medically determinable impairment and the alleged symptom or that the impairment could reasonably be expected to produce the severity of symptom alleged. *Id.* at 1282. The record does not provide any objective medical evidence in relation to Plaintiff's headaches. To the contrary, migraine headaches were reported to be well controlled with prophylactic medication and neurological exams were essentially normal through 2005. (R. at 226-27, 229.) Thus, Plaintiff cannot meet the threshold *Cotton* test.

Nonetheless, even assuming Plaintiff could satisfy the *Cotton* test, the ALJ provided "specific, clear, and convincing reasons" for rejecting Plaintiff's subjective complaints. In his decision, the ALJ considered Plaintiff's subjective complaints, including headaches, and noted activities from Plaintiff's testimony, such as caring for his two-year-old son, shopping, and using public transport. (R. at 17-18.) The ALJ summarized that "claimant can perform a variety of activities, which, while reduced, nonetheless reflect a functional capacity that is inconsistent with the severe loss of physical abilities described by claimant." (R. at 18.) After "[c]onsidering the evidence as a whole, [the ALJ did] not find that the alleged intensity, persistence, and functionally limiting effects of the subjective complaints are fully credible." (R. at 18.) The ALJ appropriately provided specific, clear, and convincing reasons for rejecting Plaintiff's subjective complaints.

Furthermore, to the extent the questionnaires entitled "Medical Assessment of Ability to Do Work Related Activities" indicate a less than full-time work capacity and are even relevant to the headache issue, these questionnaires were completed in a conclusory, check-the-box manner, and are therefore entitled to only minimal weight. (R. at 191-93, 219-21.) *See Batson v. Comm'r*, 359 F.3d 1190, 1194-95 (9th Cir. 2004) (holding that an ALJ may

1  give minimal weight to a treating physician's opinions that are based on subjective
2  complaints, conclusory, in the form of a checklist, and lack substantive medical findings to
3  support the conclusion). As noted above, substantial evidence supported the ALJ's
4  conclusion that Plaintiff's headaches were not nearly as severe as the doctors conclusively
5  represented in these questionnaires. In his decision, the ALJ stated that he did "not find
6  supporting medical evidence for their opinion in this respect." (R. at 17.) In light of the
7  conclusory form of these opinions, the ALJ properly gave minimal weight to Dr. Mane's and
8  Dr. Aguila's opinions. In sum, for the reasons provided above, the Court finds that the ALJ
9  properly rejected the opinions of Plaintiff's treating physicians.

### B. Closed Period of Benefits

Plaintiff argues that even if headache and carpal tunnel symptoms have improved, the ALJ should have considered a closed period of benefits for the period of time from onset until improvement. (Pl.'s Mem. at 6-7.) As noted in the previous section, the finding of headaches was not based on objective medical tests and was properly rejected as unsubstantiated subjective complaints. *See Batson*, 359 F.3d at 1194-95; *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting subjective pain complaints where petitioner's "claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received").

Even if carpal tunnel syndrome prevented Plaintiff from working, it did not meet the 12-month durational requirement of the Act. 20 C.F.R. § 404.1505. The record shows that objective medical tests did not indicate carpal tunnel syndrome until October 13, 2004. (R. at 201.) Less than 12 months later, on March 24, 2005, Plaintiff had left carpal tunnel release surgery with excellent results. (R. at 213, 217.) While earlier treatment notes indicate complaints of carpal tunnel syndrome, there were no objective medical findings to support Plaintiff's complaints and symptoms were not severe. (R. at 113, 150, 155-56, 159-60, 192, 198.) Accordingly, this Court upholds the ALJ's decision and finds no period of closed disability for headaches or carpal tunnel syndrome.

## VI. CONCLUSION

The Court finds that the ALJ did not commit an error of law by denying Plaintiff's claim for benefits. The Court further finds that the ALJ's decision was adequately supported by the evidence on record. Based on these findings, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross-Motion for Summary Judgment.

**IT IS THEREFORE ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. # 15) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. # 11) is **DENIED**.

DATED this 6th day of August, 2008.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge